Vail *v.* Newark Savings Institution.

---

AMANDA O. VAIL and others

*v.*

THE NEWARK SAVINGS INSTITUTION.

The charter of a savings bank authorized it to accept and execute any trusts committed to such bank, by any person, by will or otherwise, or by order of any court. Under a family agreement, $25,000 were deposited in the bank, to pay $1,460 per annum to the widow, for life, and the surplus of the income from such deposit, if any, to her children. The bank was subsequently taken under the control of this court, on a deficiency of assets to pay its depositors in full.—*Held,*

(1) That it was not established by proof that such deposit was taken by the bank as a special trust, or as a deposit differing materially from the other ordinary deposits of the bank.

41

(2) That such deposit is not entitled to preference in payment over others.

(3) That even if the trust claimed had been shown, nothing in the charter gives the fund the priority claimed, and it would not be entitled to it.

Bill for relief. On final hearing on pleadings and proofs.

*Mr. S. H. Little* and *Mr. John W. Taylor*, for complainants.

*Mr. Cortlandt Parker*, for defendants.

. THE CHANCELLOR.

The bill is filed by Stephen Vail, J. Cummings Vail, George R. Vail. and Amanda O. Vail, the last named the widow and the others sons of Alfred Vail, deceased, late of Morristown, against the Newark Savings Institution, to obtain a decree requiring that institution to secure to the complainants the repayment of $25,000 deposited with it in May, 1873; and, also, requiring it to pay to Mrs. Vail the unpaid balance of an annuity of $1,460, which the complainants allege the institution agreed to pay to her upon that deposit; and, also, to secure to be paid to her during her life, or so long as she shall remain unmarried, that annuity, and requiring the institution, in default of such security, to pay immediately to the complainants the $25,000, and to Mrs. Vail so much of the annuity as is in arrear.

The bill alleges that Alfred Vail, by his will, gave to George T. Cobb and Theodore Little, two of his executors, and to the survivor of them (Mrs. Vail being the other) his estate in trust, first, to secure to his widow, for life, so long as she should remain unmarried, an annuity of $625, in case she occupied his homestead and the furniture therein, but if the house and furniture should be sold, then the annuity was to be $1,250; that the will was duly proved by the executors, and afterwards Messrs. Little and Cobb, as

Vail v. Newark Savings Institution.

trustees, took possession of the estate; that subsequently
Mr. Cobb died, and thereby the title to the trust estate,
with the duties of the trust, devolved on Mr. Little; that
George R. Vail, the youngest son of the testator, became
of age April 6th, 1873; that Mr. Little, as trustee, on the
20th of May, in that year, with the consent of Mrs. Vail,
conveyed to the three sons, in fee, the homestead, valued at
$15,000; that there was then in the hands of the trustee,
including the estimated value of the homestead, the sum of
$6,637.25, the whole of which, by the provisions of the will,
was subject to the payment to Mrs. Vail of the annuity of
$1,260; that, besides the sum just mentioned as the esti-
mated amount of the estate, there was also in the hands of
the trustee, as part of the estate, a mortgage for $3,000,
given by William L. Humason to the testator, the interest
of which was given, by the will, to Mrs. Vail, during her
life, so long as she should remain unmarried; that the sons
were desirous of having some settlement of the estate, or
some arrangement by which the annuity payable to Mrs.
Vail should be secured to be paid to her, if possible, with-
out making it necessary to retain the whole of the estate in
the possession of the trustee for that purpose, so that a por-
tion of the estate might be distributed among them; that
Mrs. Vail was willing to consent to any arrangement which
would attain such result, provided her annuity could be
made secure to her; that, at the request of the complain-
ants, the trustee called on Mr. Dodd, the president of the
Newark Savings Institution, to ascertain whether the insti-
tution was authorized to execute a trust of that character
to secure to Mrs. Vail the annuity beyond all risk, and to
release the remainder of the estate from the lien of the
trust; that Mr. Dodd, in reply to the inquiry, said that the
charter authorized the institution to execute such trusts,
and that, on the deposit of $25,000, the amount named by
the trustee, he would agree to pay to Mrs. Vail her annuity
of $1,460, in semi-annual payments, and would pay the bal-
ance of the interest, if any, to the sons; that the deposit

was made accordingly, May 26th, 1873; that interest was paid to Mrs. Vail, in semi-annual payments, from the time of the deposit to July, 1877, when the institution declined to pay to her, for the half-year then expired, more than $625, claiming that that was all the interest to which the deposit was entitled out of the net earnings of the institution for the half-year; that her agent received it under protest, claiming the full amount of $730 as being then due; that Mrs. Vail, in August following, being informed that the institution denied that the deposit was in any way special, and repudiated the agreement to pay $1,460 per annum, consulted with the sons, and they agreed to withdraw the fund from the custody of the institution, and notified it accordingly that the fund would be withdrawn on the 1st day of January then next; that, on December 12th, 1877, after the notice of withdrawal of the deposit had been given, the institution filed its petition in this court, representing itself as being solvent, but, in consideration of the then present general financial distress and embarrassment, praying that an order might be made requiring that only such dividends should be paid to depositors after the 1st day of January then next, as should be authorized by the order of this court; that, upon that petition, this court made an order providing, among other things, that, after the service of a copy of the order, the institution should refrain from paying to any depositor any sums which, in the aggregate, should exceed eighteen per cent. of the amount of deposit standing to the credit of the depositor at the close of the 11th day of December, 1877, until the further order of the court, and that since that time the institution has declined to pay the annuity at all, and alleges that the $25,000 were a deposit of the same character as the general deposits held by the institution, and subject to all the conditions to which such deposits are subject.

The bill states that when the deposit was made, the institution, by written agreement, agreed to pay to Mrs. Vail,

semi-annually, the interest of the deposit to the amount of $1,460, until her death or remarriage.

The institution, by its answer, denies that the $25,000 were received by it in any other way than as a deposit subject to special conditions, among which was an agreement to pay a low rate of interest between the time when the deposit was made and the first day of July then next, at which date, according to the rules of the institution, the interest would have commenced.

The complainants insist that the fund in question was received by the institution as a trust, under a provision of its charter authorizing it to accept and execute trusts; that provision is as follows (*P. L. 1847 p. 107*):

" That said corporation may receive, as deposits, all sums of money which may be offered for the purpose of being invested, in such sums and at such times, and on such terms as the by-laws shall prescribe, which shall be invested accordingly, and shall be repaid to such depositors at such times, and with such interest, and under such regulations as the board of managers shall from time to time prescribe; and the said corporation may accept and execute all such trusts, of every description, as may be committed to said corporation by any person or persons whatsoever, by will or otherwise, or transferred to the same by order of any court."

While the act gives authority to accept and execute trusts, it makes no special provision for the security of the trusts mentioned, declares no preference in their favor, nor does it in any way refer to the subject. If it be admitted that the money in question was received by the institution on a trust, the right of the complainants to a decree directing the payment of the fund out of the assets of the institution in preference to the claims of other depositors, would not be apparent. If it received the money to hold it in trust, it was clearly its duty to observe its obligation as trustee, among which was that of keeping the funds and investment separate, so that they might be identified and capable of specific claim on the part of the beneficiaries or persons interested therein; and if, neglecting or disregarding its

duty in that respect, it mingled the funds of the trust indis-
tinguishably with those of the depositors, the right of the
complainants to indemnity in preference to the claims of
the depositors would be questionable, at least. But the
evidence does not establish the existence of any trust differ-
ent from that on which general deposits were held.

It appears that the deposit was made in pursuance of an
agreement, before referred to, entered into between the
sons and widow of the testator. By that agreement it was
recited that doubts existed as to the true construction of the
will, and particularly as to the amount of the estate pledged
for the payment of the annuity of the widow, and as to the
mode in which the annuity should be secured; that the sons
did not desire that the trustees should sell the homestead at
a forced or public sale, and did desire to have the estate
finally settled and the trust terminated, and that, after
securing to the widow her annuity of $1,250, and the inter-
est upon a certain bond and mortgage, called the Humason
bond and mortgage, the remainder of the estate should be
at once paid over to the sons without the intervention of
any legal proceedings; that the trustee was willing to con-
sent to the settlement, provided he could be entirely released
from his trusts and all liability incident thereto; and that
Mrs. Vail was, also, willing to assent thereto, provided the
amount coming to her by the will should be secured to her
in the manner thereinbefore mentioned; and it was declared
that, in order to accomplish the purpose just mentioned, the
parties to the agreement agreed with each other as follows:
The sons, Stephen Vail, J. Cummings Vail and George R.
Vail, agreed that the sum of $25,000, out of the assets of the
estate mentioned in the schedule thereto annexed, should
be placed, by the trustee, on deposit in the Newark Savings
Institution, in their names, to remain there as long as the
widow should live and remain unmarried, unless she should
in writing consent to some other disposition of it; the inter-
est of which sum, to the amount of $1,460 (which amount
was made up of the annuity of $1,250 and the interest on

the Humason bond and mortgage), was to be paid to her annually or semi-annually, according to the rules of the savings institution, as long as she should live and remain unmarried; the balance of the interest, if any, and, at her death or marriage, the principal sum, to be paid equally to Stephen Vail, J. Cummings Vail and George R. Vail, or their legal representatives. And it was further declared to be understood and agreed that the sum of $3,000, secured by the Humason bond and mortgage, was to constitute a part of the $25,000 above mentioned, and that, until it was collected, the trustee was only to deposit $22,000, and, inasmuch as it would only draw four per cent. interest until after the first day of July then next, the sons agreed to pay the widow interest at seven per cent. on that sum of $22,000, from the sixth day of April of that year, less such sum as might be paid by the institution, so far only, however, as to secure to her interest at the rate of $1,250 per year. And it was further understood that the interest on the Humason bond and mortgage, until the principal sum was collected, was to be paid to the widow. And she, by the agreement, in consideration of the premises and of the deposits to be made for her benefit as before mentioned, agreed to accept the sum of $1,460 annually, as long as she should live and remain unmarried, to be paid in the manner thereinbefore mentioned, in lieu of, and in full satisfaction for, all the pecuniary bequests, devises and provisions for her benefit contained in the will, and to look to the Newark Savings Institution alone, after the deposit should have been made, for the payment of the annuity.

Mr. Little testifies that he was anxious to be freed from the trust, if possible, which, by the will, was to last during Mrs. Vail's life-time, or so long as she remained a widow, and suggested to the parties that probably some arrangement could be made with some savings or trust institution, upon a deposit with them of some portion of the estate, to agree to pay Mrs. Vail her annuity, and so release the balance of the estate, which could be then paid over to the

three sons; that they all consented to the arrangement, if it could be effected; that he suggested that it was probable that one of the savings institutions of Newark would be willing to take a deposit of $25,000 and agree to pay that annuity. He says he called upon Mr. Dodd, the president of the Newark Savings Institution, on the subject, and stated the matter to him, and inquired if that institution was authorized to execute a trust of that kind. He says that Mr. Dodd said it was, and was taking trusts of different kinds all the time, and that, upon the deposit of $25,000 by him (Mr. Little) for the complainants, the institution would agree to pay Mrs. Vail her annuity annually, and the balance of the interest, if any, to the sons equally, the principal not to be drawn from the bank during Mrs. Vail's life-time, except by the written consent of all parties. He insists that the money was deposited with the bank in trust, accordingly, and on an agreement, as part of the trust, that the institution would absolutely, and at all events, and in any contingency, pay to Mrs. Vail the sum of $1,460 a year, as an annuity.

On the other hand, Mr. Dodd denies that the money was received upon those terms, or upon any trust at all; he alleges that what he said to Mr. Little was a suggestion that the institution might accept the discharge of the trust in the manner directed, or it might accept a deposit of the money, taking Mr. Little's directions as to the persons to whom the dividends were to be paid, as they were made from time to time. He swears, positively, that the agreement was not that the institution was to be trustee of the estate, but that it was simply to receive the deposit and pay such rates of interest as it should, from time to time, pay to its ordinary depositors, to the persons and in the manner directed by the trustee.

These two gentlemen are the only persons who can speak of the terms on which, or the capacity in which, the deposit was made and accepted. The negotiations were conducted entirely by them, and there is no witness except themselves

Vail *v.* Newark Savings Institution.

to their conversations. They are diametrically opposed to one another in their recollections of what transpired; the one insisting that the money was accepted to be held in trust, with an absolute agreement to pay $1,460 per annum during the life-time of Mrs. Vail, or so long as the money should remain in the custody of the institution, and the other as positively denying that such was the arrangement, and positively stating that the arrangement was that the institution should receive the money as a deposit, and pay interest on it according to the directions of Mr. Little.

In this contrariety of testimony, it becomes necessary to have recourse to the other evidence in the case, for the purpose of ascertaining the nature of the transaction, and that evidence clearly shows that the money was received upon no trust, but merely as a deposit on special terms. In the first place, there is no written evidence that the money was received in trust at all; the word " trust " is not mentioned in connection with the deposit in any of the papers or documents. In his letter to Mr. Dodd, dated May 21st, 1873, Mr. Little states that, in closing up the estate of the testator, the widow and children had agreed to have $25,000 deposited in the Newark Savings Institution, and he sends an abstract of the agreement; he adds that, if the deposit can be made on the terms mentioned, he will bring or send a draft for the amount; that he would like it to be stated that the deposit was received from him as trustee, and that he would also like some kind of certificate, which he could give to the widow and children. The abstract of agreement which he enclosed is as follows :

### "AGREEMENT.

" To deposit $25,000 in the Newark Savings Institution in the names of Stephen Vail, J. Cummings Vail and George R. Vail, to remain as long as Amanda O. Vail, widow of Alfred Vail, deceased, shall live and remain unmarried, unless she shall consent, in writing, to some other disposition of it; the interest of which sum is to be paid to said Amanda O. Vail, annually or semi-annually, to the amount of $1,460 ; the balance of interest to be paid equally to said Stephen Vail, J.

Cummings Vail and George R. Vail, and, at her death or marriage, the said principal sum to be paid equally to said Stephen, J. Cummings and George, or their legal representatives."

When the money was deposited, a receipt was given to Mr. Little, as trustee, for the $25,000, strictly in accordance with the terms of that abstract; the receipt acknowledged the receipt of the money to be deposited in the institution in the names of the sons, to remain as long as Mrs. Vail should live and remain unmarried, unless she should consent, in writing, to some other disposition of the money, the interest of the sum to be paid to her semi-annually, to the amount of $1,460, the balance of the interest to be paid equally to the sons, and on her death or remarriage the property to be paid equally to the sons or their legal representatives.

The deposit-book appears to have been sent to Mr. Little on or about the 28th of May, 1873; it states the account as being between the Newark Savings Institution and the sons, and declares that it is a deposit, with special conditions. Neither this book nor the receipt was ever called in question by any of the parties, nor were their terms objected to. No complaint was made that they contained no evidence of the existence of a trust on the part of the institution, nor that they did not truly express the real arrangement on which the money had been delivered and accepted.

As before remarked, the word "trust" is not mentioned in any of the letters or documents. And so the matter stood, until in view of the embarrassment of the institution, an order had been made by this court restraining it from paying out its assets, except according to the directions of this court. Nor had the transaction of the delivery of the fund to the institution and the receipt thereof by it, any of the characteristics of a trust.

It is insisted, as has been before stated, that, by the agreement, the institution was and is bound to pay, not so much interest or income as may be received from the fund in the due course of administration of the alleged trust, but abso-

Vail *v.* Newark Savings Institution.

lutely, and at all events, and in any contingency, the highest rate of interest which was then lawful, seven per cent. per annum. No provision or stipulation was made in regard to the investment, nor was there any understanding on that score; nor was there any provision whatever for compensation to the alleged trustee. It was bound, according to the claim of the complainants, to pay the highest legal rate of interest, and that, too, without compensation, and to take all the risks of the investment. It is reasonable to suppose that if a trust had been contemplated, the transfer of the funds to the institution would have been accompanied by a declaration on its part of the fact that the money was received upon a trust, with a statement of the terms and provisions of the trust.

It seems entirely probable that, in the family arrangement which resulted in the deposit of the fund, all that was contemplated, in respect to securing the annuity for the widow, was, that a fund sufficiently large to produce, at the existing rate of interest, the amount of her annuity, should be placed in some safe savings institution. This appears quite clearly from the testimony of Mr. Little. He says: "I was anxious to be freed from the trust, if possible, which, by the will, was to last during Mrs. Vail's lifetime, or while she remained a widow, and suggested to all the parties that probably some arrangement could be made with some savings or trust institution, upon the deposit with it of some portion of the estate, to agree to pay to Mrs. Vail her annuity, and so release the balance of the estate, which could then be paid over to the three boys. They all assented to the arrangement, if it could be made. I suggested to them that the probability was that one of the savings institutions of Newark would be willing to take a deposit of $25,000, and agree to pay that annuity." He also says that the name of the institution was left blank in the agreement when it was drawn, in order that it might be ascertained whether the Newark Savings Institution, which was the one which he recommended to the parties, would

take the deposit on the terms of the agreement, and, if not, that they might see some other one.

It appears, then, that their object was to find some institution, whether a trust company or a savings bank, which would accept the $25,000 and agree to pay the annuity. The authority of the bank or institution to receive and execute trusts appears not to have entered into their calculations. All that they desired was, that an institution of satisfactory responsibility should accept the fund, and, in consideration of the use thereof, agree to pay an amount of interest at least equal to the amount of the annuity to the widow. The arrangement which they contemplated and desired to effect, was a contract to pay interest, not a trust. That no administration of the fund as a trust was contemplated, would appear from the fact that a positive stipulation was, as they insist, made in this case for an absolute amount of interest (the highest lawful rate), without regard to the safety of the principal, and with no provision for its security or in regard to its investment. And here it may be observed that the receipt given for the money to Mr. Little is given to him in his capacity as trustee, and is precisely such a one as would have been given, under the circumstances, if no trust had been contemplated on the part of the institution, but merely a deposit of the fund by the trustee in the names of the sons, with a provision as to the payment of the interest to the widow and to them, and for the final disposition of the fund. So that the receipt not only furnishes no evidence of a trust on the part of the institution, but is rather evidence to the contrary.

As late as November 9th, 1877, the fund is spoken of by Mr. Little, in his letter of that date to the treasurer of the institution, as the "Vail deposit" of $25,000. In that letter he says : " It will be necessary to have some change made, by which the money can be made to produce enough to pay Mrs. Vail's annuity. Perhaps an arrangement can be made with your institution ; but, as that is uncertain, I would, as attorney of all the parties, desire to give notice of a with-

drawal of the deposit after January, when the semi-annual interest will be due, as I understand. I now represent all the parties, and only desire to see the amount so secured as to be safe, and yield the necessary amount of interest." It will be seen that even at that late day, no claim was made that the institution held the fund in trust, but it was characterized as a deposit, and it was declared that a change would be necessary to obtain a higher rate of interest than the institution was then paying, and the suggestion was made that perhaps such an arrangement for higher interest might be made with the institution itself.

It should be stated that Mr. Dodd denies that the institution agreed to pay interest at the rate of seven per cent. absolutely, and at all events; and, on the other hand, says that the agreement was, that the institution should pay interest upon the deposit at the rate of four per cent. until the commencement of the next quarter after the deposit was received, which began July first, and that after that time it should be at the regular rate paid to other depositors from time to time; and he says explicitly, that no arrangement whatever was made in regard to the rate of interest other than that; that the institution continued to pay the interest according to the agreement, as the dividends were declared from time to time by it; that in the year 1876, it became the policy of the board to decline to accept large deposits, and to attempt to get rid of those they had on hand by paying them off, and that the rate of interest was likewise reduced to six per cent. He also says that a proposition was made, nearly a year before the suspension of the institution, that the fund should be withdrawn, or that it should be received from the institution by an assignment by the latter of good bonds and mortgages bearing interest at the rate of seven per cent. per annum; that various negotiations were had upon the subject; that the institution offered to give the complainants any mortgages which they might select from those which the institution held, and that it was agreed upon, verbally, in a general way, that the

deposit should be withdrawn in that way, by their accepting from the institution the bonds and mortgages, but that the matter was not consummated. He also says that, at the time of the suspension of the institution, Mr. Little claimed that the institution had accepted the money as a special deposit, upon which it agreed to pay seven per cent. interest, and that he (Dodd) immediately dissented from that proposition. It is to be observed that the receipt declares that the interest of the sum is to be paid to Mrs. Vail semi-annually, to the amount of $1,460, the balance of the interest to be paid equally to the sons; but there is no express provision that the institution shall pay $1,460 per annum absolutely, or any particular rate of interest.

It appears by the bill, as before stated, that the institution is in the hands of this court, subject to its direction as to the payment of its assets to its creditors and depositors. The complainants are not creditors in the sense in which the term is used, in contradistinction from the depositors, but they are depositors, and as such must be content to receive the dividends and payments which from time to time may be made under the direction of the court. The only provision for special deposits is contained in the proviso to the seventh article of the by-laws of the institution, which is, that nothing in that or the preceding article should prevent the funding committee from making special contracts with depositors on sums exceeding $1,000. The special contracts there referred to have reference to the rate of interest and the power of withdrawal. Deposits received on such contracts are not strictly special deposits; they are deposits received on special terms, and they are not entitled to a preference over general deposits. *Attorney-General* v. *Mechanics and Laborers Savings Bank, 5 Stew. Eq. 163.*

The prayer of the bill, that the institution may be required to secure to the complainants the repayment of the fund, and to pay to Mrs. Vail the balance of the $1,460 per year remaining unpaid, and to secure it to her for the future during her life or widowhood, and that, in default

of the security, the institution may be required to pay over to the complainants the fund, and to Mrs. Vail the arrears of the alleged annuity, must, therefore, be denied.

The bill will be dismissed, with costs.